## IN THE MATTER OF ARCHY, ON HABEAS CORPUS.

The right of transit through each State, with every species of property known to the Constitution of the United States, and recognized by that paramount law, is secured by that instrument to each citizen, and does not depend upon the uncertain and changeable ground of mere comity.

The character of immigrant or traveler, bringing with him a slave into this State, must last so long as it is necessary, by the ordinary modes of travel, to accomplish a transit through the State. Nothing but accident or imperative necessity could excuse a greater delay. Something more than mere ease or convenience must intervene to save a forfeiture of property which he cannot hold as a citizen of the State through which he is passing.

But visitors for health or pleasure, stand in a position different from travelers on business, and are protected by the law of comity.

It is the right of the judiciary, in the absence of legislation, to determine how far the policy and position of this State will justify the giving a temporary effect, within the limits of this State, to the laws and institutions of a sister State. To allow mere visitors to this State for pleasure or health, to bring with them, as personal attendants, their own domestics, is not any violation of the end contemplated by the Constitution of this State.

The visible acts of a party must be taken as the only test of his intentions, in deciding whether he is entitled to be considered a mere visitor; of which fact his declarations constitute no evidence.

The privileges extended to visitors cannot be extended to those who come for both business and pleasure. A mere visitor is one who comes only for pleasure or health, and who engages in no business while here, and remains only for a reasonable time. If the party engage in any business, or employ his slave in any business except as a personal attendant upon himself or family, then the character of visitor is lost, and his slave is entitled to freedom.

This rule admits of no exception upon the ground of necessity or misfortune, or it would introduce uncertainty and complexity, and lead the Courts into profitless investigations. The pecuniary condition of the party is difficult of proof and will not be inquired into; nor will the rule be relaxed to meet the hardships of a particular case.—*Burnett, J.*

Where the facts show that the delay of the visitor was unavoidable, the fact of his engaging in labor, in order to support himself during his necessary detention, does not divest his rights under the law of comity.—*Terry, C. J.*

HABEAS CORPUS.

Charles A. Stovall, a citizen of the State of Mississippi, petitioned this Court for a writ of *habeas corpus*, for the recovery of his slave, Archy. The writ was issued, and on the return thereof, the following argument of counsel, and decision of the Court was made.

The facts appear in the opinion of the Court.

*James H. Hardy*, of counsel for Petitioner, Stovall.

There is no question, from the return of the writ and evidence in the case, that the boy Archy was a slave owned and held to service by the petitioner, in the State of Mississippi. Nor is there any pretence of any voluntary or actual emancipation of the slave by his master.

Counsel for the slave, however, have urged that he was

voluntarily brought to this state by his master, and that he is thereby manumitted.

In reply, I contend that there is no proof in the case that Archy was brought voluntarily into this State by his master. The whole evidence shows that he owed service in Mississippi—that about the first of January last, he was in this State with his master, and that when about leaving the State he escaped from him.

In support of petitioner's right to remove the slave I contend:

1. That the eighteenth section of the first article of the Constitution of this State is inoperative, and requires legislative aid in the shape of penalties, and manner of procedure, to give it effect.

2. That for the purpose of transit or sojourning in or through the State, he has fully and completely the guaranty of the Constitution of the United States.

3. That even if the eighteenth section of the first article of the Constitution be operative upon our citizens, it has no effect as against travelers or sojourners, by reason of the constitutional provisions both of this State and of the United States; and,

4. That no emancipation of the slave can be had or presumed without due process of law.

1. The eighteenth section of the Constitution of this State reads: "Neither slavery nor involuntary servitude except for the punishment of crimes shall ever be tolerated in this State." My argument is that this section is addressed to the Legislature, and is a prohibition to the passage of any law tolerating slavery; perhaps it is a command to the Legislature that a law be passed with proper penalties to prohibit the institution of slavery. But there is no magic in those few words which would destroy the rights of property, nor can I conceive of a thing so absurd as a Court attaching penalties to a law which the law itself does not contain. Every law must possess the remedial virtue as well as the declaratory, or it is worthless. Blackstone's Commentaries, vol. 1, pp. 56–7.

So here, if the framers of the Constitution intended this section to operate as law, they have failed to so support it with penal sanction as to give it that effect. It was lost labor to say, "slavery shall not be tolerated," unless they cause to be added to the clause, "emancipation," or other penalty, "shall be the consequence of a violation of this declaration."

The utter helplessness and imbecility of the section, standing alone, show conclusively that the framers of the Constitution looked to the Legislature to carry out the anti-slavery provision. And this view is further strengthened by the fact that Constitutions are not intended to operate directly. The philosophy of a Constitution is to prescribe rules and fix restrictions upon the

different branches of government, and the means of enforcing constitutional provisions are almost universally left for the Legislature to prescribe.

Mr. Clay, in a very learned argument, in a case involving the effect of a constitutional prohibition, used this apt and illustrative language:

"The nature of Constitutions is to establish and declare principles, and except in some particular cases to leave to the Legislature the enactment of laws to carry out the principles thus declared." 15 Pet. U. S. R., 483.

Mr. Webster, in the same case, expressed the same view, more at length. In speaking of the effect of the prohibition, he says:

"It is clear, that if it was intended to be, in itself, a law which would carry into effect the principle declared by it, it would have gone further—it would have made provisions which would secure its execution."

Again, he says:

"As it stands in the Constitution, it is entirely powerless and nugatory. The importation of slaves was prohibited. How prohibited? How prevented? Forfeited if brought in the State? Emancipated? No such provision. Neither of these results would follow, and the constitutional declaration, without penalties and further provision, was a dead letter—a nullity." 15 Pet. 491–2.

Slavery is to be prohibited in this State. How is it to be prohibited? What will become of the slave when brought into the State? Will he be executed? Or emancipated? Will you consecrate the slave to freedom, or confiscate the lands of the owner? The Constitution and the Legislature have left us in the dark as to the penalty.

This view of the case is supported by the decision of the Supreme Court of the United States, in the case of Groves v. Slaughter, 15 Pet., 496 to 503.

This last case is cited and approved by the Supreme Court of this State, in the case of Perkins on *habeas corpus.* 2 California Rep., 455.

Indeed, so entirely reasonable and consistent with principle is this view of the force of the eighteenth section, that I can scarcely conceive of the effect of a contrary doctrine.

Counsel for the slave have contended that this provision is intended to secure personal liberty, and therefore must be construed as operative without legislative sanction.

If the truth of the hypothesis were admitted, the conclusion could not follow which counsel have formed. But I cannot consent to stultify the members of the convention who framed, or my fellow-citizens who ratified the Constitution, by the indulgence of the thought that the section in view owed its place in

the Constitution to so blind an infatuation as sympathy for a few hundred negro slaves.

I had always supposed that the anti-slavery clause of our Constitution was a measure of State policy.

I regard this section like every other police regulation, as having been engrafted in the Constitution because the members of the convention deemed it for the public good; and, as every other police ordinance, it requires the sanction of penalties to give it validity.

Even in this State, slavery is only *mala prohibita,* and surely a man may do what is not morally wrong until the act is prohibited and made penal. Blackstone's Com., vol. 1, 58.

This view of the section is further strengthened by a recurrence to the history of the times in which it had its origin.

At the time of the formation of the Constitution of this State, there were a large number of slaves in the State who were owned and held to service here. By the Constitution and laws of the United States, slavery was then tolerated here, and might be continued so long as the State remained a territory. Dred Scott *v.* Sanford, 19 Howard R.

I am further confirmed in my view by a thought of the anomalous idea of a Court prescribing penalties for the violation of a Constitution. One Judge would prescribe emancipation of the slave; another, less opposed to slavery, would find a milder punishment, and so on through a catalogue of variations; each Judge must descend from his high dignity of expounding what the law is, to the forum of the politician and maker of law.

But counsel argue, that slavery is so unnatural, and is so essentially the creature of positive law, that in the absence of municipal regulation, every man must be free.

If this theory be true, we have the sanction of positive law for slavery even in California. As has been before argued, slavery exists by virtue of the Constitution and laws of the United States in all the territories of the Union, and in all of the States where it has not been excluded by positive law enacted by their law-making power. So that, in California, slavery having been planted here by the operation of the Constitution of the United States, it must continue to exist here until the Legislature, by the enactment of sufficient prohibitions and penalties, has asserted the paramount sovereignty of the State. Dred Scott case, 19 Howard's U. S. Reports.

The counsel, who claims for slavery an origin in municipal regulation, argues but little for his knowledge of history, and less for his knowledge of law.

Blackstone himself says, that slavery had its origin, *jus gentium,* and was based on the right of the captor, in case of war, to the life or services of the captive. 1 Black. Com., 424.

If this be true, it proves that slavery is not the creature of

legislation, for the laws of nations is at best but a moral rule of action, having its origin in the laws of nature.    1 Kent's Commentaries, p. 2.

Slavery derives its force and dignity from the same principles of right and reason, the same views of the nature and constitution of man, and the same sanction of Divine revelation as those from which the science of morality is deduced.    Its effect, is the moral and physical improvement of the slave himself.

Blackstone, with all of his abhorrence of slavery, does not pretend to controvert the fact, that slavery was of immemorial custom and usage, nor did he pretend to ascribe it to municipal regulation; and when it is conceded by this author that slavery is and has been, from time immemorial, a custom and usage, he has established for us an institution of the common law, which, he says, has not its existence by virtue of enactment, but because it has been the practice of mankind, from a time beyond which the mind of man runneth not to the contrary.

The most learned jurist of England since the days of Lord Hale, one who, upon the subject of international law, stands second to none on earth, has said of slavery, "It never was in Antigua the creature of law, but of that custom which operates with the force of law."    Slave Grace, 2 Haggard's Reports, 126, et seq.

What positive law gave the parent the right to the custody of his child?    What municipal regulation gave the guardian the right to the services of his ward?    That general usage resulting from necessity, which is the origin of almost every human institution.    It is to the same usage and necessity that the relation of master and slave is attributable, and neither of the former relations have claim to greater antiquity than the latter, nor are they more consonant with sound morality and religion.

It has been said by an English author, that "personal slavery, arising out of forcible captivity, is coeval with the earliest periods of the history of mankind.    It is found existing, and as far as appears, without animadversion, in the earliest and most authentic records of the human race.    It is recognized by the codes of the most polished races of antiquity.    Under the light of Christianity itself, the possession of persons so acquired has been, in every civilized country, invested with the character of property, and secured as such by all the protections of law."    Wildman's International Law, p. 10.

The same author refers to a decision rendered by Justice McLean in the U. S. Circuit Court, in which that Justice, true to his instincts, says, "Slavery, being unjust, inhuman, and unnecessary, is a violation of the law of nature, and, therefore, contrary to the law of nations."    The author says, "this opinion is elaborately incorrect, and founded upon erroneous principles."    Ibid., 99.

2. That the petitioner has the guaranty and sanction of the Constitution of the United States of the privileges of transit and sojourn through or in any of the States, and that his personal property may be carried with him, without any danger of loss or confiscation by the peculiar ordinances of the State through which he may pass, or in which he may be situated as a sojourner.

The government of the United States is one made up of many. The North and the South are blended together for the common defence, " to form a more perfect union," to " establish justice," " insure domestic tranquility," " and to promote the general welfare," and to secure the blessings of liberty to ourselves and our posterity.

At the time of the adoption of the Constitution, nearly all of the States were slave States, and the citizens of each were deeply interested in slave property. Is it possible that the framers of the Constitution ever dreamt, in the formation of a more perfect union, that they were confining the citizens of each State to the enjoyment of his rights in that State alone ?

If these States had remained separate, there is no question that the citizens of each might, by the laws which govern separate nations, have traveled through or sojourned in any of the States, and that his property, though with him in that State, would have remained his, and his rights over it would have been enforced.

Did the formation of a " more perfect union" between States destroy rights which would have been secured by the laws of nations to each of the States ? Is " justice" established by the confiscation of a citizen's property because his interest or his pleasure has induced him to visit a sister State ? Is " domestic tranquility insured " by an instrument which secures to the citizen of one State the full, free, and perfect enjoyment of his peculiar property, but denies the same rights to citizens of other States with their peculiar property ?

Is " domestic tranquility insured " by saying to the citizens of one of the States, " if a citizen of another State travel this way with his property, you may set upon him and plunder him of his estate, and your State (by some local regulation) may protect you in an act that would have been a felony had it been done to a subject of a foreign nation ?"

Does the Constitution of the United States provide for the " general welfare" if it be true that California may, by her local legislation, do acts to the citizens of Mississippi, which, if done by a foreign nation, would be just cause of war ?

The second section of the fourth article of the Constitution provides, that " the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." Is this provision consistent with a State regulation which would

deny the immunities of a citizen in this State to a citizen of the State of Mississippi?

But the most palpable and unmistakable evidence that the framers of the Constitution intended to give this kind of property the protection of the federal government, is found in the latter part of the same section: "No person held to service or labor in one State under the laws thereof, escaping into another, shall in consequence of any law or regulation therein be discharged from such service or labor." But counsel argue that this clause relates to fugitive slaves. Does it? Archy is a fugitive slave! He has escaped from his master; he is in this State. Is he made free by any regulation in this State? The section referred to says not.

If the petitioner had come into this State for a domicil, his position would be different—he and his property must depend upon and be judged by the laws of his home. But as a citizen of Mississippi, traveling through or sojourning in this State, he is protected by the Constitution of the United States, and that instrument secures him everywhere in the rights he had in his own State, and, so long as he retains the *animo revertendi*, that Constitution guaranties that his rights shall be judged in all the States by the laws of his domicil.

3. If the eighteenth article of our Constitution be operative, and took effect *eo instanti* upon the admission of California into the Union, it could only take effect in this State, and upon citizens of this State.

Persons traveling through this State were never under the operation of that Constitution. The laws of a foreign State do not operate upon an alien traveler or sojourner. He is bound by none of the laws of the State through which he may pass, except, perhaps, her criminal law. He must not commit any crimes—but with respect to his property it is deemed and taken to be a part of his own State's total wealth, and is not subject to any regulation of the State through which he passes.

Kent says: "Every nation is bound in time of peace to grant a passage, for lawful purposes, over their lands, rivers, and seas, to the people of other States, whenever it can be permitted without inconvenience, and burdensome conditions ought not to be annexed to the transit of persons and property." 1 Kent Commentaries, 34.

Lydia *v.* Rankin, 2 A. K. Marshall Kentucky Reports; Strader *v.* Graham, 7 B. Monroe.

In Illinois, the rule has been fully considered and approved, and the mistress of a slave, temporarily sojourning in Illinois with her property, was held to have lost none of her rights over her property; and when the slave escaped, the person who harbored her was held responsible for his crime to the laws of Illinois. The People *v.* Willard, 4 Scammon.

In the case of The Louis, Sir William Scott used this language: "It is pressed as a difficulty what is to be done if a French ship, laden with slaves, is brought in? I answer, without hesitation, restore the possession which has been unlawfully divested, rescind the illegal act done by your own subject, and leave the foreigner to the justice of his own country." Cited in the case of The Antelope, 10 Wheaton, 119.

This doctrine has been fully affirmed by the Supreme Court of the United States, in the case of The Antelope, 10 Wheaton, 120. And Chief Justice Marshall, in rendering the opinion, declares that, "though the slave trade is prohibited by the laws of the United States, and though the slaving-vessel and her commander be brought into the United States for adjudication, the vessel and slaves must be restored to the owner." And he says that "the law of the domicil of the slaver not having prohibited the slave trade, the Courts of the United States have no power, notwithstanding the prohibition by our law, to punish the party engaged in it, either personally or by deprivation of property."

And why not? Because, being a citizen of another nation, his wrongful acts must be addressed to his own nation for adjudication and punishment.

Is the analogy not striking? The petitioner owned this slave in his own State; he was his own property, and by accident, necessity, or choice, has been temporarily found in this State.

If it be true that the laws of this State prohibit slavery, remember that he asserts his claim not by virtue of California's laws, but those of Mississippi. Shall his slave be emancipated by a California Court? No, rather refer the question of his freedom or slavery to the petitioner's own Courts—to the slave's own Courts—and with their decision not only we, but the people, and, over all—the law—will be satisfied. Deny him that, and you deny him justice.

Another principle which lies at the foundation of the master's claim is the principle *lex loci*. Every agreement or obligation is to be carried out in each State according to the law of the State where the agreement is to be executed, or where the obligation is due.

The obligation of this slave is to serve his master in Mississippi; that obligation was created in and must be carried out by the laws of Mississippi.

Mr. Justice Story says: "As to acts done and rights acquired in other countries, the law of the country where the acts are done or the rights are acquired will generally govern in respect to the capacity, state, and condition of the person. And, therefore, in regard to questions concerning infancy, competency to marry, incapacities incident to coverture, guardianship, and other personal relations and rights, the law of the domicil is not

generally to govern, but the *lex loci contractus aut actus.*"  Story's Conflict of Laws, ch. 4, pp. 96–8.

If, as I think none will deny, the relation of master and servant is a civil and personal relation, there can be no further question that the laws of Mississippi and not of this State are to govern the Court in its decision.   And it must not be forgotten that the relations of master and servant are like those of guardian and ward, parent and child, or any other relation involving mutual interests, duties, and responsibilities.

4. No emancipation or other deprivation of one's property can be made or presumed without due process of law.

The eighth section of the first article of the Constitution of this State secures the owner in the protection of his property on as sacred grounds as the eighteenth section does the police of the State, and when the framers of the Constitution directed the Legislature to pass a law to prohibit slavery as a matter of State policy, they had already, as an act of palpable justice, secured private property from the haste of legislation.

Mr. Chancellor Kent says, of due process of law:   "It means law in its regular course of administration through Courts of Justice."   1 Kent Com., 613; 2 ib., 14.

Justice Bronson, in the case of Taylor *v.* Porter, says:   "The words 'due process of law' in the Constitution cannot mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property."   Taylor *v.* Porter, 4 Hill, 147.

Chief Justice Ruffin says that these words "mean that statutes which would deprive a person of the right of property without a regular trial according to the course and usage of the common law, would not be due process of law in the sense of the Constitution."   Hoke *v.* Henderson, 4 Devereux N. C. R., 15.

Now, if the petitioner has lost his property in the slave, it must arise from one of two causes:

*First*—He must have been guilty of some offence against the laws of this State, the penalty of which is to forfeit his property, or,

*Second*—By some act of his own, or by operation of law, the slave must have become the property of some other person, or have become free.

If his title had been divested by the first means, he has not yet been tried or convicted according to the "course and usage of the common law."   Nor has he been convicted of any offence according to any of the modes "prescribed for ascertaining guilt."

If the negro is free, let it be asserted in a Court competent to try the matter, and such a Court can only be found in the State of Mississippi.

As to the power of the Court to award the slave to the peti-

tioner, it is only necessary to refer to the *Habeas Corpus* Act, Wood's Digest, p. 477, §§ 26 and 34.

*Winans*, of counsel for Archy.

Conceding that Stovall left Mississippi with the intention of returning in eighteen months, that would have allowed him a year's residence or sojourn in this State.  If he designed to be a sojourner here for that time, and to carry on business, and let out his slave during that time for hire, he would be acting in violation of the spirit and meaning of the constitutional prohibition of slavery.  But after his arrival here he appears to have entertained nothing but a remote undeveloped intention of leaving the State at some future unascertained period—if we judge from his statements; but if we judge from his acts, he appears to have invested himself with all the rights, attributes, and characteristics of continuing citizenship.  He made his advertisement for scholars, and announced his school as permanent, not as transient.  The business is one which for its success looks to permanency.  He also hired out Archy from time to time, and told the parties hiring him that they could keep him as long as they chose, saying nothing about intending to leave the State.

This question is not to be settled in his favor by simply proving that he retained the *animus revertendi*.  If that alone was the criterion, he might preserve the *animus* for years, continuing here and enjoying all the rights, immunities, and advantages of citizenship the while.  The true criterion is this, (if the doctrine of comity be sustained,) was he simply engaged in an actual passage or transit through the State, and were the circumstances which detained him of such an unavoidable character that they still preserved him in a condition of actual transit?  The case of Julia *v.* McKinney, 3 Missouri, 270, is a leading authority on this subject.

The same doctrine is declared and affirmed in Wilson *v.* Melvin, 4 Missouri, 597.

Now, if these cases be authority, they establish the fact that where the doctrine of comity is recognized and enforced, it only applies to travelers through a State, and does not extend its operation to sojourners therein at all.  A sojourner is a "temporary resident."  (Webster's Dictionary.)

The points established by these cases in Missouri are two: first, that the principle of comity, where it is recognized, can only be applied to a traveler, not a sojourner, and that even in the case of a traveler he must travel through the State with all reasonable expedition, incurring no delays but such as are unavoidable; and secondly, that for a master to hire a slave to labor for only one or two days and receive the compensation therefor in a free State, entitles the slave to his freedom.

If Stovall was not accidentally overtaken, while here, by a

stress of unforeseen circumstances which compelled him to do as he did, and contrary to his original intention, then certainly he violated the provision of our Constitution in reference to servitude, and the slave is entitled to his freedom.

The claimant entered our State with a full knowledge of its institutions; he commenced the pursuit of business and the acquisition of fortune here in obedience to our laws. He thereby obtained and enjoyed all the advantages of citizenship. Should he not be subject to all the disabilities thereof? Should he not yield to the restraints which are enjoined on those who own the ties of citizenship? Would it be just to give him all the rights, emoluments, and safeguards of a citizen of California, and yet, because he cherished a purpose to return to another State, of different institutions, throw around him the broad mantle of its privileges, conflicting and discordant though they be? If, on the one hand, a true national feeling shall induce us to preserve faithfully all the equipoises of the Federal Constitution, on the other a decent respect for our institutions should demand that we maintain them for ever sacred and inviolate. Have we delegated such power as is here claimed to the federal government? Assuredly not, for the claimant has in vain invoked the aid of federal authorities. Have we conceded it unto our sister States from the powers reserved to us by virtue of our sovereignty? Certainly not, for there is no provision in our Constitution, no law upon our statute-book, that justifies this claimant in his application. See opinion of Judge Burnett, in Nougues v. Johnson, 7 Cal. R.

Thus far we have considered the case from the assumption that a proper regard for international law or the principle of comity among the several States, should preserve the rights of masters over their slaves while in a condition of actual transit or journey through free States. But,

2. The weight of authority is against the application of the principle of comity to any cases which affect the liberty of slaves brought voluntarily within the limits of free States. Case of Somerset, 20 Howell's State Trials, 79; Story on Conflict of Laws, §§ 96 and 244; Edition of 1846, pp. 371–2.

In Forbes v. Crane, 2 Barn. & Cress., 471, Best, C. J., says: "The plaintiff, therefore, must recover here upon what is called the *comitas inter communitates;* but this is a maxim that cannot prevail in any case where it violates the law of our country, the law of nature, or the law of God." And for the full exposition of the English doctrine on this subject, see same case, p. 448, et seq.; Ohio Insurance Co. v. Edmondson, 5 Louisiana, 295, 299, 300.

"Contracts which are in evasion or fraud of the rights of a country, or the rights or duties of its subjects; contracts against good morals, or against religion, or against public rights; and

**11**

contracts opposed to the national policy, or national institutions, are deemed nullities in every country affected by such considerations; although they may be valid by the laws of the place where they are made." Story on Conflict of Law, 244; and see opinion per Chief Justice Taney, in Bank of Augusta v. Earle, 13 Peters, 516, 589.

"It is needless to enumerate the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another, where the rights of individuals are concerned. The cases of contracts made in a foreign country are familiar examples, and Courts of Justice have always expounded and executed them according to the laws of the place in which they were made; provided that law was not. repugnant to the laws or policy of their own country. The comity thus extended to other nations, is no impeachment of their sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissible when contrary to its policy, or prejudicial to its interests."

In the case of Willard v. The People, 4 Scammon, 461, it is held by Judge Douglas that comity, so far as that State is concerned, its local position between two slave States being considered, will sustain the right of transit with slaves through that State. This is the only adjudication of the question in favor of comity in such cases, to be found in any of the reports, and is entirely swept away by the force of conflicting authority in other States.

The doctrine of comity in regard to transit, even, is expressly denied in The People v. Lemmon, 5 Sandford, 711, 812, where it is shown that such denial existed not only in England, but also in France, and originated with the civil law. See opinion of Judge Paine. On the seventh of December, 1857, the Supreme Court of the State of New York, in full bench, rendered an opinion in the case of the slave Lemmon, in which they expressly deny the right of transit with slaves. Upon the question of comity, the Court held the following language:

"Comity does not require any State to extend any greater privileges to the citizens of another State, than it grants to its own. As this State does not allow its own citizens to bring a slave here, even in transitu, and to hold him a slave for any portion of time, it cannot be expected to allow citizens of another State to do so." ·

This doctrine is further and fully sustained in the case of Nancy Jackson v. Bullock, 12 Connecticut, 53. See opinion of the Court in that case, which is most emphatic on this point. The same principle is also affirmed in the case of Collins v. America, 9 B. Monroe, 569, which is the most recent decision in the Supreme Court of Kentucky on this subject.

The same denial of the right of comity, where it clashes with

the laws of a State, or its institutions, or interferes with the rights of its citizens, is declared in Holmes *v.* Remson, 20 Johnson, 263.   See, also, Prigg *v.* Commonwealth of Pennsylvania, 16 Peters, 611, in which case it is denied that by the general law of nations the state of slavery is recognized in the free States. It admits that it may be recognized as a matter of comity; but considers that comity as arising from the laws of the State, and not from the decisions of its Courts in the absence of any law upon the subject.

In the case of the Commonwealth *v.* Aves, 18 Pickering, 217, it is declared "that the law arising from the comity of nations cannot apply, because if it did, it would follow as a necessary consequence, that all those persons who by force of local laws, and within all foreign places where slavery is permitted, have acquired slaves as property, might bring their slaves here, and exercise over them the rights and power which an owner of property might exercise, and for any length of time short of acquiring a domicil."   And see, further, Commonwealth *v.* Aves, 18 Pick., 193, et seq., where the slave was declared free, although only brought by its master as a waiter on a temporary visit of the master to a relation.

Again, the Constitution of the United States declares that no person held to labor and service in one State under the laws thereof, escaping into another, shall in consequence of any law or regulation thereof be discharged from such service or labor. Hence the implication is strong, indeed (as it emanates from a constitutional provision) conclusive, that such persons as do not escape, but whose owners voluntary bring them, may be discharged by the laws or regulations of the State into which they are thus brought.   For if this were not so, to what use would be the prohibition.   Besides, according to the doctrine of Marbury *v.* Madison, 1 Cranch, which has been so often recognized and acted upon by this Court, the assertion of an affirmative proposition implies the negative of all other objects than those affirmed, and it cannot be presumed that any clause of the Constitution is intended to be without effect.   See Hunter *v.* Fulcher, 1 Leigh Rep., 172; Harvey *v.* Decker, Walker's (Mississippi) Rep., 36, in which the doctrine is also declared that slavery exists, and can only exist, through municipal regulations.   Maria Louise *v.* Marcot, 8 Louisiana, 475: "The operation of foreign laws upon slavery is immediate and perfect;" "it operates to produce immediate emancipation."

But this Court has heretofore passed upon this question, in the matter of Perkins, 2 California, 441, and it is there held that while the slave, by being taken upon free soil, does not become *ipso facto* free, yet that the master's control over him ceases, and he becomes therefore virtually free.

Now, if this Court recognize the doctrine of *stare decisis*, for

this is not a mere *dictum*, then the application of the claimant must be denied. See, also, Lansford *v.* Coquillon, 24 Martin's Rep., 403, and Ex parte Simmons, 4 Washington C. C. Rep., 396. And see Butler *v.* Hoffer, 1 Washington C. C. Rep., 499. And again, in Commonwealth *v.* Aves, 18 Pick., 218, where the doctrine of Lord Stowell is favorably cited, the Court says:

"The principle above stated, in which a slave brought there becomes free, is that he becomes entitled to the protection of our laws, and there is no law to warrant his arrest and forcible removal."

This is the very doctrine of Judge Murray, declared in the matter of Carter, 2 Cal., 441.

Now, in determining how far, under our seemingly absolute and uncompromising constitutional prohibition of slavery, the principles of comity should (within the constitutional restraints) be allowed, the Legislature passed the act of April 15, 1852, entitled "an act respecting fugitives from labor, and slaves brought to this State prior to her admission into the Union," in which they provided for the reclamation of fugitives escaping into the State, and also for the immediate transportation from the State of slaves brought here before the adoption of the Constitution. These constitute the entire concessions and provisions of the act, and in section five, it is provided that even in the case of a slave brought here before the Constitution, if his master seeks to reclaim him he shall not, after such reclamation, hold him in servitude in the State, except for the purposes of his immediate removal. This act was to continue in force for only twelve months, and was renewed for another twelve months by the act of 1853, after and since which time even these privileges were and have been denied to the citizens of this and other States. By this act the Legislature established three conclusions of their sovereign will:

1. That they recognized the constitutional prohibition of involuntary servitude.

2. That they did not consider such prohibition as preventing them from allowing, by comity, the reclamation of slaves brought here before the adoption of the Constitution—and were willing, therefore, to carry the doctrine of comity so far, and, of course, by necessary implication, no further; and

3. That even this concession was but temporary, and designed to be withdrawn after a brief period by the express provisions of the act.

In upholding the institutions of other governments, we cannot carry the doctrine of courtesy so far as to subvert our own. And whatever violates the spirit of our laws, the policy of our government, and the rights of our citizens, certainly has a tendency to subvert our institutions. The Dred Scott case, of which so much has been said, does not conflict with the principles here

contended for.  It only declares that slaves being property, the master has a right to hold them in servitude in any portion of the federal territory, but it does not attempt to conclude or pass upon the rights of the sovereign States in this behalf; and if it had so done, it would have laid the cherished doctrine of State sovereignty—a doctrine no less dear to all the sister States than slavery can be to those who own it as their institution—completely prostrate in the dust.

BURNETT, J.—The petitioner, Charles A. Stovall, states, substantially, that he is a citizen of the State of Mississippi; that he is the owner of Archy, a slave, and as such entitled to his custody; that said slave has escaped from the petitioner, and is now in the charge of one James Lansing, who detains him in the city-prison of Sacramento; that Lansing has no legal authority to detain said slave; and that petitioner desires immediately to remove said slave from this State to the State of Mississippi. The petitioner then prays that said slave may be returned to his custody.

The material facts of the case, as shown upon the hearing, were substantially these:

The petitioner had been in delicate health for some five years, and, in the spring of 1857, determined to make the trip to California, across the Plains, and to bring Archy, who was a family negro servant, nineteen years of age, with him.  The petitioner stated that he was going to California for his health; that that was the grand object of the trip; that he did not intend to remain in this State but a short time, not more than eighteen months, and then to return home by water.  The petitioner left his wagon and team in Carson Valley, because his oxen were not in a condition to cross the mountains.  He also purchased a rancho in that valley.  He and Archy arrived in this city about the second day of October last.  After arriving in this city he hired out Archy for upwards of a month.  Most of the wages earned by Archy were paid to him, but a portion was paid by the hirer to Stovall, after Archy became sick.  While Archy was sick, about eighteen days, he was well taken care of by the petitioner.  The petitioner opened and taught a private school for something over two months, in this city.  During this time he often stated that it was his intention to return.  There was proof going to show that the petitioner was short of means upon his arrival in this State.  After the petitioner and Archy had been here upwards of two months, the petitioner placed Archy upon one of the river steamers, with the intention and for the purpose of sending him to San Francisco, and from thence to Mississippi, in charge of an agent.  The boy having escaped from the boat, the petitioner made affidavit before a justice of the peace, who issued his warrant commanding the officer to arrest Archy and

deliver him to the petitioner. Under this warrant Archy was arrested by a policeman of this city, who delivered him to Lansing, chief of police, who detains him in the city-prison, and refuses to deliver him to the petitioner.

This case has excited much interest and feeling, and gives rise to many questions of great delicacy. It is not so much the rights of the parties immediately concerned in this particular case, as the bearing of the decision upon our future relations with our sister States, that gives to the subject its greatest importance. The responsibilities thus thrown upon the Court we must discharge to the best of our ability. In discharging this grave duty, we can say, in the language of a distinguished jurist, Mr. Justice Mills, (2 A. K. Marsh., 815,) that "we disclaim the influence of the general principles of liberty, which we all admire, and conceive it should be decided by the law as it is, and not as it ought to be."

It is only our province to construe and apply the existing law. Whether that law be just or unjust, is a question for the lawmaker, not for the Courts. It is not necessary therefore to inquire whether slavery is or is not contrary to the law of nature. Our individual opinions upon this question are of no importance in this case. The institution exists by positive law, and that positive law is paramount, and must be enforced.

It must be concluded that, where slavery exists, the right of property of the master in the slave must follow as a necessary incident. This right of property is recognized by the Constitution of the United States. (Dred Scott v. Sandford, 19 Howard, 451.)

The right of property having been recognized by the supreme law of the land, certain logical results must follow this recognition. If property, it must, from the nature of the case, be entitled, so far as the action of the federal government is concerned, to the same protection as other property. If permitted to exist by the general law, then it must be protected by the general law, so far as that general law would protect any other property. No distinction can be made by this law between the different descriptions of private property.

If, then, in virtue of the paramount sovereignty of the United States, the citizens of each State have the right to pass through the other States, with *any* property whatever, are they not equally entitled to this right of transit with their slaves? Is not this right of free passage a right that necessarily flows from the relation that the States sustain to each other, under the general bond of the Union? We are *one* government, for certain specified purposes; and is not this right of transit across the territory of a sister State one of the necessary incidents of the purposes and ends for which the federal government was created?

That this right of transit with slaves through a free State exists, there would seem to be no reasonble doubt. But, as to whether it exists by constitutional right, or by the law of comity, there may exist different opinions. Mr. Justice Mills, in the leading case in Kentucky, of Lydia v. Rankin, (2 A. K. Marsh, 820,) sustains the right, under the law of nations. In the case of Willard v. The People, (4 Scam. Rep., 461,) the Supreme Court of Illinois decided that a citizen of Louisiana had the right to pass through that State with a slave. Mr. Justice Skates placed his decision both upon the law of comity and the Constitution of the United States; while Chief Justice Wilson and Mr. Justice Lockwood based their decision upon the law of comity. The Supreme Court of Missouri placed this right upon constitutional grounds, (Julia v. McKinney, 3 Mo. Rep., 272.) And I am not aware that this right has ever been denied to exist by the Supreme Court of any State, except by that of New York, in the case of The People v. Lemmon, (5 Sand., 711, 712.) In the case of The Commonwealth v. Aves, (18 Pick., 224,) the Supreme Court of Massachusetts notice the question, but express no opinion in reference to it. " Our geographical position," say the Court, " exempts us from the probable necessity of considering such a case, and we give no opinion respecting it."

If we place this right of transit upon the ground of comity, then it rests exclusively in the discretion of each State. (Story's Con. of Laws, § 244; Bank of Augusta v. Earl, 13 Peters, 519, 589; Jackson v. Bullock, 12 Conn. Rep., 53; Collins v. America, 9 B. Mon., 569, 571; Forbes v. Cochrane, 2 Barn. & Cres., 471.) Slavery being regarded by the law of nations as a mere municipal regulation, founded upon and limited by the local law, no other nation is bound to recognize the state of slavery, as to foreign slaves, within its own territorial dominions, when it is opposed to its own policy. (Prigg v. The Commonwealth, 16 Peters, 540.) The rule that slavery, when judged by the law of nations, is a mere local institution, and one upon which that general law does not operate, would seem to be clear. From this principle it follows, that the right of transit with property, through the territory of a friendly State, secured by the law of nations, to the citizens or subjects of other States, applies only to such property as merchandise, or inanimate things, and not to slaves. The law of nations only protects such things as are generally recognized as property by civilized nations. Property, only recognized as such by the *local* law, from the nature of the case, cannot claim the protection of this *general* law. (The People v. Lemmon, 5 Sandford, 681; The Commonwealth v. Aves, 18 Pick., 217.)

Our conclusion is, that the right of transit through each State, with every species of property known to the Constitution of the United States, and recognized by that paramount law, is secured

by that instrument to each citizen, and does not depend upon the uncertain and changeable ground of mere comity.

It remains, then, to inquire whether the petitioner was a mere traveler through this State. Traveling is a passing from place to place—the act of performing a journey; and a traveler is a person who travels.

In the case of Julia *v.* McKinney, (3 Mo. Rep., 273,) Judge McGirk uses this clear and intelligible language: "How long the character of immigrant or traveler through the State may last, cannot, by any general rule, be determined; but it seems that reason does require it should last so long as might be necessary, according to the common modes of traveling, to accomplish a transit through the State. If any accident should happen to the immigrant, which, in ordinary cases, would make it reasonable and prudent for him to suspend his journey for a short time, we think he might do so without incurring a forfeiture, if he resumed his journey as soon as he safely could. Something more than mere convenience or ease of the immigrant ought to intervene to save him from a forfeiture. Something of the nature of necessity should exist before he would or ought to be exempt from the forfeiture. If swollen streams of water, which could not be crossed without danger, should intervene; serious sickness of the family; broken wagons, and the like, should exist, there would be good cause of delay so long as they exist, if the journey is resumed as soon as these impediments are removed, provided all due diligence is used to remove them."

In the subsequent case of Wilson *v.* Melvin, (4 Mo. R., 592,) it was held that the true test, as to whether the master violated the Constitution of Illinois in passing through that State, was whether he made any unnecessary delay in passing with his slave; and not whether the slave acquired any residence; and not whether the master became a domiciliated resident of Illinois. In the case of Ralph *v.* Duncan, (3 Mo. R., 195,) it was held that the master who permits his slave to go to Illinois to hire himself out, commits as great an offence against the Ordinance of 1787 as he who takes his slave along with him to reside there. This decision is affirmed in the case in 4 Mo. R., 598. And in the latter case, the Court said: "And still less will it avail him, that the slave is not under his *coercion* while staying in Illinois. Under his own inspection, the slave would probably conduct himself with propriety; suffered to ramble, and undertake work where he pleased, his opportunities to do mischief would be much greater."

These rules were laid down by the Supreme Court of Missouri at a time when there was little or no excitement upon the subject, and when a more fraternal feeling existed among the citizens of different States, than has been lately manifested by many persons of extreme views in all portions of the Union. They

are, for that reason, the more entitled to our calm respect. They would seem to be founded upon a due consideration of the rights, both of the free and slave States.    They are, in our view, eminently just and sensible in themselves, and susceptible of plain and practical application.    The right of transit with slaves through a free State is secured to the owner; but this right must be exercised with a strict regard to the laws of the State through which the transit is made.    The traveler must pursue his journey with no *unnecessary delay;* and to excuse any delay he may make, something of *necessity* must exist, such as "swollen streams, serious sickness in the family, broken wagons, and the like."    The cases mentioned are all of such a character that no foresight or precaution could prevent them; nor could such foresight do away with their *effects* when they should occur, and those are all facts susceptible of easy proof.

The question then arises whether the conduct of the petitioner as a traveler comes within the principles laid down.    The theory of the petitioner is, that he was compelled to leave his wagon and team in Carson Valley, and remain here until the succeeding spring; that he was short of means, and that he and Archy were obliged to resort to business to defray expenses in the meantime, so as to be able to return home when he could dispose of his property.

Conceding, for the sake of the argument, all that is claimed by the petitioner, the excuse alleged does not, in our view, come within the rule.    It was not such a case of necessity as to justify the interruption of the journey.    The inability of his team to cross the mountains could not, perhaps, have been prevented; but the effect of this want could have been obviated by proper caution.    True, he might have been subjected to some pecuniary loss by at once pursuing his journey; but this is a mere inconvenience, and not such a circumstance as will excuse the delay.    In the case from 3 Mo. R., 274, the same ground was urged; but it was held insufficient.    The Court then said: "In this case, we see nothing in the nature of accident to prevent the owner from taking the plaintiff to Missouri immediately.    The excuse set up is, that the owner was a widow, and might not have had the means of immediate transportation of the slave to Missouri; that she was a new-comer in the country, and might be poor, and, therefore, unable to do it; that some reasonable time ought to be allowed to her to provide a residence for herself and family, and that one month, in this case, is not too much.    We are of opinion, that the excuse, to raise an exception, must be something more than the mere convenience or inconvenience of the owner."    And in the same case it was held, that when a person did not intend to introduce slavery into the State of Illinois, but did in fact do so, the slave was entitled to her freedom.

But there is another important aspect in which this case may be viewed, and that is, to regard the petitioner as a mere visitor for health or pleasure. And it is conceived that this question is very different from the other, and depends upon the law of comity, and not upon constitutional right.

In the case of Strader v. Graham, (10 How. R., 93,) the Supreme Court of the United States held this language:

"Every State has an undoubted right to determine the *status*, or domestic and social condition, of the persons domiciled within its territory; except in so far as the powers of the States in this respect are restrained or duties and obligations imposed upon them by the Constitution of the United States."

And in the case of the City of New York v. Miln, (11 Peters, 138,) it was held, "that all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called *internal police*, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified, and exclusive."

In the case of Strader v. Graham, the owner of certain slaves, who were musicians, permitted them to go from the State of Kentucky to Cincinnati, in the State of Ohio, for a temporary business purpose. The slaves were there employed as musical performers, for hire, and then returned home, and afterwards sued for their freedom. The Supreme Court of Kentucky held that they did not become free. (5 B. Monroe, 183; 8 B. Monroe, 635.) Upon writ of error to the Supreme Court of the United States, that Court held it had no jurisdiction of the case, as no law of the Union was involved in its determination.

The question, whether a citizen of a sister State shall be permitted to remain a reasonable time simply as a visitor with his slaves, and under what conditions, is a question purely of local jurisdiction, and must depend upon the peculiar policy and situation of each State. It is insisted by the learned counsel for Archy that the question of comity is one for the Legislature to determine, and not for the Courts. This is certainly a very important power, and one that partakes of a mixed character. It is both legislative and judicial. It would seem almost impracticable for the Legislature to provide for all the instances where the law of comity must be applied. And until the Legislature does make provision, the Courts are under the necessity of determining how far the rule of comity must apply. Such has been the practice of the Courts, as stated by Judge Story, in his Con. of Laws, page 25. So, also, Chief Justice Parker, in the case of Blanchard v. Russel, (13 Mass. Rep., 6,) says: "As the laws of foreign countries are not admitted *ex proprio vigore*, but only *ex comitate*, the judicial power will exercise a discretion with respect to the laws they may be called upon to sanction; for if they

should be manifestly unjust, or calculated to injure their own citizens, they ought to be rejected."

The same principle was asserted by Mr. Justice Lockwood, in his able opinion in the case of Willard v. The People, (4 Scam., 474.) After stating the principle, the learned Justice asks: "Is the case presented in the record of such a character as to appeal to the sound discretion of this Court to enforce the laws and institutions of a sister State? In answering this question, regard should be had to the geographical position of Illinois, as well as to the relations we sustain to our sister States, confederated under the same general government."

We conceive it to be the right of the judiciary, especially in the absence of any legislation upon the subject, to determine how far the situation of this State, its policy, and condition, would justify us in giving effect, for a temporary period, to the laws and institutions of other States within our own territorial limits. This question, we conceive, should be decided with a sincere desire to extend to our fellow-citizens of other States, all the hospitalities consistent with our own just rights.

The geographical position of California, with respect to the other States of the Union, is peculiar. Such is our situation, that a citizen of a slave State will scarcely, if ever, wish to pass through this State with his slave, as a mere traveler, either for business or pleasure. But our position, climate, and productions, all naturally invite our fellow-citizens as visitors. When they come to visit us, for health or pleasure, shall they be permitted to bring their domestic servants with them, to attend upon them or their families as waiters? The citizens of the free States can bring their confidential servants with them—why should not the citizens of the slave States be allowed the same privilege? It is true, the domestics in the one' case are hired servants, while in the other they are slaves. But should this induce us to exclude the one and admit the other? Persons who live in the slave States, and have long been accustomed to their own domestics, who constitute, in fact, a part of the family, very naturally desire, in making visits, to take these domestics with them, especially when they come as invalids seeking for health. It is our policy and duty not to clog the privilege of visiting us, with unnecessary restrictions. We look forward to the day when California will be frequented by visitors from all parts of the Union. We have every reason to expect it.

But this privilege should be confined strictly to mere visitors, and not extended to those who come for both business and pleasure. And the character of visitor should be determined solely by the acts of the person, and not by his declarations. In a case like this, we conceive the declarations of a party, or his intentions, constitute no test and no evidence. The Supreme Court of Missouri was right, when deciding that, though a par-

ty did not intend to introduce slavery into Illinois, but did in fact do so, he incurred a forfeiture of his slave. The fact of intention is often difficult to ascertain; it is the secret and invisible determination of the mind; and, unless shown by outward acts, cannot be known. On the contrary, the visible acts of a party are susceptible of easy proof, and the inquiry becomes simple and certain.

As acts must constitute the true test, whether the party be a mere visitor or not, those acts should be clearly defined, that the party may know the exact extent of the privilege granted. In our view, a mere visitor is one who comes only for pleasure or health, and who engages in no business while here, and remains only for a reasonable time. If the party engages in any business himself, or employ his slave in any business, except as a mere personal attendant upon himself, or family, then the character of visitor is lost, and his slave is entitled to freedom; and we cannot admit of any exception to this rule, upon the ground of necessity or misfortune. Were we to do so, it would introduce uncertainty and complexity, and lead our Courts into profitless investigations. We cannot ascertain, with any certainty, the pecuniary condition of the party. It is a matter difficult to show. He may have ample means, and yet have the appearance of present poverty. This is a question we will not inquire into; we prefer a plain, practical, and efficient rule; one that all can understand and follow. It is true that unforeseen losses may sometimes occur to visitors; but there are so many ways in which their effects may be obviated, without engaging in business, that we cannot relax the rule to meet the hardships of a particular case. Prudence and foresight will guard against these pecuniary losses, in most cases; and, if not in all, it must be regarded as the misfortune of the visitor.

In the case of Julia v. McKinney, already referred to, it was decided by the Supreme Court of Missouri, that the hiring out of the slave for one or two days, in the State of Illinois, incurred a forfeiture, under the second section of the sixth article of the Constitution of that State. That section provided " that no person bound to labor in any other State, shall be hired to labor in this State, except within the tract reserved for the salt works," etc.

There is no such provision in our Constitution; but the question arises whether such a prohibition does not necessarily result from the general principle. This section in the Constitution of Illinois was necessary, to mark the exception to the general rule excluding slavery from the State. Had no exception been intended, then it is conceived that such a provision would have been unnecessary. But if a citizen of another State should be permitted to hire out his slave, or use his labor in the prosecution of any business, even for a temporary period, and with

the intent to return again to his own State, it would, in our opinion, be a violation of the Constitution of this State. It was the very purpose of the Constitution to prohibit such a state of things. It would be allowing a privilege to the citizens of other States, in the prosecution of their business in this State, which our Constitution denies to our own citizens. This is a privilege that the Constitution of the United States does not secure to the citizens of other States. The provision that "the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States," secures to a citizen from home, in a sister State, the privileges enjoyed by the citizens of the State where he is a sojourner, and no more. If put upon an equality with our own citizens, in the prosecution of his business in this State, there can be no just ground for complaint. The sojourner has no right to enter with slave-labor into business competition with those who are not allowed the same privilege. Even in the case of a fugitive slave, the owner has only the right, under the Constitution of the United States, to remove him from the free State in which he may be found, and not the right to employ him in labor, even for a temporary period and purpose.

But to allow mere visitors to this State, for pleasure or health, to bring with them, as personal attendants, their own domestics, is not, in our view, any violation of the end contemplated by the Constitution of this State. Such a rule will not, in its general operation, interfere with the business or social condition of our own citizens.

It is insisted by the learned counsel for the petitioner that the provision of the eighteenth section of the first article of the Constitution of this State—that "neither slavery nor involuntary servitude, unless for the punishment of crimes, shall ever be tolerated in this State"—is merely directory to the Legislature; and until some act is passed by that body to give effect to this constitutional provision, it remains dormant and inoperative. In support of this view, we are referred to the case of Graves and others *v.* Slaughter, (14 Peters, 449,) and to the opinion of Mr. Justice Anderson, in the case of Perkins, (2 Cal. R., 424, 455.)

The case reported in Peters was a suit upon a promissory note given for slaves introduced into the State of Mississippi as merchandise. The Constitution of that State provided that "the introduction of slaves into this State as merchandise, or for sale, shall be prohibited from and after the first day of May, 1833," with an exception as to such as may be introduced by actual settlers previous to the year 1845. Mr. Justice Thompson who delivered the opinion of the Court, said: "This obviously points to something more to be done, and looks to some future time,

not only for its fulfillment, but for the means by which it was to be accomplished."

It will be seen that the provision regards the *introduction* of slaves for certain purposes, and that it does not, either expressly or by logical deduction, declare the consequences of its violation. Whether the slaves thus introduced were to be free, or whether the person who introduced them should be punished criminally, cannot be known from the provision itself. This provision, from its language and the purpose to be accomplished, could only depend upon future legislation to carry it into effect. It did not, in and of itself, and by its own innate force, operate upon the State of the slave, *after* being introduced into the State.

But the provision in our Constitution is entirely different, both in its language and in the logical deductions flowing from it. It is negative and restrictive in its terms and effect, and by its own force accomplishes the end aimed at. It operates directly upon the state of individuals within our own territorial limits, and provides that the state of slavery should not exist therein. And when the state of slavery is abolished, then each individual is placed upon an equality, and in the contemplation of the Constitution, equally free, with all the incidents necessarily attached to the state of freedom. This provision of the Constitution was operative from the time the other provisions became operative. It was not a provision addressed solely to the legislative conscience, and dependent upon future legislation to carry it into practical effect.

It is difficult to conceive how a negative and restrictive provision of the Constitution can be merely directory. When power is withheld, or a certain state prohibited, the provision must, from the very nature of the case, be conclusive. True, such a provision may be addressed solely to the Legislature, or to the Executive, and not to the Courts. But, when so addressed, there should be something, either in the language of the instrument or in the nature of the provision itself, to show that the judiciary have nothing to do with cases arising under it.

In the case of Rankin *v.* Lydia, (2 A. K. Marsh., 470,) we have an authority in point. The ordinance of Congress for the government of the territory northwest of the river Ohio, contained this provision:

" *There shall be neither slavery nor involuntary servitude* in the said Territory, other than in punishment of crimes whereof the party shall have been duly convicted. *Provided,* always, that any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original States, such fugitive may be reclaimed and conveyed to the person claiming his or her labor, as aforesaid."

It will be seen, upon comparison, how similar in substance is the language of this provision and that of the Constitution of

this State. The learned Judge who delivered the opinion of the Court in that case, said : " The words of the ordinance are extremely clear and forcible—'there shall be neither slavery nor involuntary servitude'—a strong mode of expressing that every inhabitant *shall be free;* thus using a figure of speech not uncommon, which, by expressing what shall *not,* declares emphatically *what shall be.* If a slave, then, could exist and reside in the Territory, and be there a slave, the ordinance could not be true; for slavery existed, the ordinance notwithstanding." We must think that the case reported in 14 Peters, already referred to, has no application to this provision of the Constitution of California; and that the learned Justice of this Court was mistaken in its application. It will be seen from the separate opinion of the Chief Justice, that he did not take the same view of this authority as did Mr. Justice Anderson. At least, there is nothing in the opinion to show that the Chief Justice relied upon this authority to sustain his decision.

From the views we have expressed, it would seem clear that the petitioner cannot sustain either the character of traveler or visitor. But there are circumstances connected with this particular case that may exempt him from the operation of the rules we have laid down. This is the first case that has occurred under the existing law; and from the opinion of Mr. Justice Anderson, and the silence of the Chief Justice, the petitioner had some reason to believe that the constitutional provision would have no immediate operation. This is the first case; and under these circumstances we are not disposed to rigidly enforce the rule for the first time. But, in reference to all future cases, it is our purpose to enforce the rules laid down strictly, according to their true intent and spirit.

It is therefore ordered, that Archy be forthwith released from the custody of the Chief of Police, and given into the custody of the petitioner, Charles A. Stovall.

TERRY, C. J.—I concur in the judgment, and in the principles announced in the opinion of my associate; while I do not entirely agree with his conclusions from the facts of the case. I think the delay of the petitioner was unavoidable, and that the fact of his engaging in labor in order to support himself during his necessary detention, did not divest his rights under the law of comity, as laid down in the opinion.