Leo **HANDEL**, Leon and Shari **Kabiljo**, and Isaac and Hanna **Handy**, on behalf of themselves and all other situated persons, Plaintiffs,

v.

Andrija **ARTUKOVIC**, a/k/a Alois Anich, a/k/a David Arnaut, on behalf of himself and as representative of the Independent Government of the State of Croatia, Defendant.

No. CV 84–1411–PAR(Kx).

United States District Court, C.D. California.

Jan. 31, 1985.

Marc M. Seltzer, Corinblit, Shapero & Seltzer; Alschuler, Grossman & Pines, Los Angeles, Cal., Michael D. Hausfeld, Kohn, Milstein, Cohen & Hausfeld; Finley, Kumble, Wagner, Heine, Underberg & Casey; Martin Mendelsohn, Washington, D.C., Coleman R. Rosenfield, Hollywood, Fla., for plaintiffs.

Richard A. Perkins, Los Angeles, Cal., for defendant.

David A. Lehrer, Los Angeles, Justin Finger, Jeffrey P. Sinensky, Ruti G. Teitel, New York City, amicus curiae for Anti-Defamation League of B'nai B'rith.

Joan Hartman, Paul Hoffman, Kay Huff, Ralph Steinhardt, Los Angeles, Cal., amicus curiae for ACLU Foundation.

## MEMORANDUM OF DECISON
## AND ORDER

RYMER, District Judge.

Plaintiffs in this class action seek compensatory and punitive damages against defendant for his alleged involvement in the deprivations of life and property suffered by the Jews in Yugoslavia during World War II. The complaint, which must be taken as true for purposes of this motion, alleges that defendant was the Commissioner of Public Security and Internal Administration and later the Minister of the Interior for the Independent State of Croatia, a puppet state of the German Reich established after its invasion of the Kingdom of Yugoslavia. In his official capacity, defendant oversaw and implemented Croatia's solution to "the Jewish question." The result of defendant's implementation of this policy was the passage of anti-Jewish legislation; the seizure of property owned by Croatian Jews; and the imprisonment and eventual execution of tens of thousands of Jewish men, women, and children.

The complaint avers that defendant fled Croatia in 1945, and that he entered this country illegally in 1949. In May 1951, defendant was the subject of deportation proceedings. These proceedings eventually culminated in the grant to defendant in 1959 of a temporary stay of deportation, and defendant has remained in the United States until the present. Plaintiffs state that they were Jewish citizens of Yugoslavia in 1941, and each had close relatives who were murdered under the auspices of Croatian authority. All of the plaintiffs are now United States citizens.

In their complaint, plaintiffs state four causes of action: (1) violation of the Hague Convention of 1907 and the Geneva Convention of 1929; (2) war crimes in violation of international law; (3) crimes against humanity in violation of international law; and (4) violation of Articles 100, 125, 141, and 145 of the Yugoslavian Criminal Code.

Jurisdiction for the first three causes of action is based on 28 U.S.C. § 1331; jurisdiction over the fourth claim is predicated upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Defendant has moved to dismiss under Fed.R.Civ.P. 12(b)(1) and (6).

After having considered the briefs of the parties and the amici as well as the voluminous exhibits submitted in this case, the Court concludes that the international law claims should be dismissed under Fed.R. Civ.P. 12(b)(1) for lack of subject matter jurisdiction. The war crime and crime against humanity claims are also barred by the statute of limitations, and therefore fail to state a claim for relief. Fed.R.Civ.P. 12(b)(6). The Court finds that the Yugoslavian law claim is barred by the applicable statute of limitations; and that to apply Yugoslavian substantive law as requested would in any event be unconstitutional under United States law as well as unenforceable under Yugoslavian and international law. The Yugoslavian law count therefore also fails to state a claim upon which relief can be granted.[1]

## I. Violation of the Hague and Geneva Conventions.

Pursuant to 28 U.S.C. § 1331, the Court has jurisdiction over actions "arising under" the "Constitution, laws, or treaties" of the United States. In plaintiffs' third count, they assert a cause of action under two United States treaties: the Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539 ("Hague Convention"); and the Convention Between the United States of America and other Powers Relating to Prisoners of War, July 27, 1929, 47 Stat. 2021 (1932), *revised in* Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135 ("Geneva Convention").

---

1. Since the time that the Court took this matter under submission, extradition proceedings have been initiated against the defendant. Because this is a civil action and involves altogether different considerations, nothing said or held in this matter should be taken in any way as bearing on the issues or the proper result in that proceeding.

■ Treaties of the United States rarely bear such a direct relationship to a private claim that the claim may be said to "arise under" the treaty as required by section 1331. *See* 13B Wright, Miller & Cooper, **Federal Practice & Procedure-Jurisdiction** § 3562 (1984). In the absence of authorizing legislation, an individual may enforce a treaty's provisions only when it is self-executing, i.e., when it expressly or impliedly provides a private right of action. *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 808 (D.C.Cir.1984) (Bork, J., concurring); *Dreyfus v. Von Finck,* 534 F.2d 24, 30 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976).

■ The Court must look to the treaty as a whole to determine whether it is self-executing. *Diggs v. Richardson,* 555 F.2d 848, 851 (D.C.Cir.1976). Four factors are relevant to such a determination:

The extent to which an international agreement establishes affirmative and judicially enforceable obligations without implementing legislation must be determined in each case by reference to many contextual factors: [1] the purposes of the treaty and the objectives of its creators, [2] the existence of domestic procedures and institutions appropriate for direct implementation, [3] the availability and feasibility of alternative enforcement methods, and [4] the immediate and long-range social consequences of self- or non-self-execution.

*People of Saipan v. United States Dep't of Interior,* 502 F.2d 90, 97 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).

■ Applying these factors to the two treaties before the Court, it is clear that neither the 1929 Geneva Convention nor the Hague Convention was intended to establish judicially enforceable obligations. In Article 129 of the 1949 Geneva Convention that adopted and revised the 1929 agreement, the signatory countries specifically provided for implementation through municipal law. A treaty which provides that signatory states will take measures through their own laws to enforce its provisions evinces an intent that the treaty not be self-executing. *See, e.g., Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 311–14, 7 L.Ed. 415 (1829), *overruled on other grounds, United States v. Percheman,* 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1833). As a result, the Geneva Convention does not offer plaintiffs a private right of action. *See Tel-Oren,* 726 F.2d at 809 (Bork, J., concurring).

Unlike the Geneva Convention, there is no provision in the Hague Convention for implementation by the party states. However, the consequences of implying self-execution compel the conclusion that the treaty is not a source of rights enforceable by an individual litigant in a domestic court. Recognition of a private remedy under the Convention would create insurmountable problems for the legal system that attempted it; would potentially interfere with foreign relations; and would pose serious problems of fairness in enforcement. As pointed out by Judge Bork in his opinion in *Tel-Oren:*

[T]he code of behavior the Conventions set out could create perhaps hundreds of thousands or millions of lawsuits by the many individuals, including prisoners of war, who might think their rights under the Hague Convention violated in the course of any large-scale war. Those lawsuits might be far beyond the capacity of any legal system to resolve at all, much less accurately and fairly; and the courts of a victorious nation might well be less hospitable to such suits against that nation or the members of its armed forces than the courts of a defeated nation might, perforce, have to be. Finally, the prospect of innumerable private suits at the end of a war might be an obstacle to the negotiation of peace and the resumption of normal relations between nations.

726 F.2d at 810 (Bork, J., concurring). *Accord, Dreyfus,* 534 F.2d at 30. No court in the seventy eight years since the Convention's adoption has concluded that the treaty was self-executing. For the reasons that Judge Bork outlined, this Court agrees that non-self-execution is the appropriate result.

■. Thus, neither of the treaties relied upon by plaintiffs gives them a private right of action "arising under" the treaties within the meaning of section 1331. The first count therefore must be dismissed for want of jurisdiction under Rule 12(b)(1).

## II. Violation of Customary International Law.

Plaintiffs' second and third claims for relief are based on alleged violations of the laws of war [2] and the laws of humanity. Two issues are presented by these claims: first, whether the Court has jurisdiction over such claims under section 1331; and second, if the Court does have jurisdiction, whether plaintiffs have stated a cognizable claim for relief under international law. The Court concludes that it does not have jurisdiction under section 1331, and, even if it did, plaintiffs fail to state a claim upon which relief may be granted.

### A. Jurisdiction under Section 1331.

■ Plaintiffs' international law claims, like their treaty claims, must "arise under" the "laws of the United States" for jurisdiction to lie. It is clear that the law of nations "is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). As Judge Kaufman stated in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980):

The law of nations forms an integral part of the common law, and a review of the history surrounding the adoption of the Constitution demonstrates that it be-

came a part of the common law of the United States upon the adoption of the Constitution.

630 F.2d at 886. *Accord, Tel-Oren,* 726 F.2d at 810 (Bork, J., concurring); *see generally* Moore, *Federalism and Foreign Relations,* 1965 **Duke L.J.** 248, 291–97.

The more difficult issue is whether plaintiffs have a claim "arising under" the law of nations. Plaintiffs contend that because international law is part of federal common law, the Court should find an explicit or implicit right of action for its enforcement. There are three possible sources for such a private right of action: an explicit grant of authority under 28 U.S.C. § 1331; an implicit right derived from the law of nations; or an implicit right derived from federal common law.

■ Section 1331 does not provide plaintiffs with a right of action. Although two recent circuit court opinions, *Filartiga* and Judge Edwards' concurrence in *Tel-Oren,* have found that 28 U.S.C. § 1350 creates a private right to sue for violations of the law of nations, it is clear that the result would be different if section 1331 rather than section 1350 were the applicable jurisdictional statute:

Unlike section 1331, which requires that an action "arise under" the laws of the United States, section 1350 does not require that the action "arise under" the law of nations, but only mandates a "violation of the law of nations" in order to create a cause of action. The language of the statute is explicit on this issue: by its express terms, nothing more than a *violation* of the law of nations is required to invoke section 1350. Judge

---

**2.** Although the Court does not need to reach the issue for purposes of this motion, plaintiffs do not appear to have stated a cognizable claim under the laws of war. "War crimes" refers to criminal actions taken against the soldiers or civilians of *another* country rather than against the defendant's fellow citizens. This limitation on the meaning of "war crimes" is reflected in the Charter of the International Military Tribunal annexed to the Agreement for the Establishment of an International Military Tribunal, U.S. Department of State, Trial of War Criminals 13, Department of State Pub. No. 2420 (1945), 39

AM.J.INTL.L.SUPP. 257 (1945). The Charter defines war crimes in relevant part as "murder, ill-treatment or deportation to slave labor or for any other purpose of civilian population *of or in occupied territory.*" By contrast, crimes against humanity include "murder, extermination, enslavement, deportation, and other inhumane acts committed against *any* civilian population." Plaintiffs lived within the boundaries of the Croatian state, and therefore defendant's conduct violated the laws of humanity but not the laws of war.

Bork nevertheless would propose to write into section 1350 an additional restriction that is not even suggested by the statutory language. Congress, of course, knew full well that it could draft section 1350 with "arising under" language, or the equivalent, to require a "cause of action" or "right to sue," but it chose not to do so.

*Tel-Oren*, 726 F.2d at 779 (Edwards, J., concurring). Thus, while the "violation" language of section 1350 may be interpreted as explicitly granting a cause of action, the "arising under" language of section 1331 cannot be so interpreted. Section 1331, standing alone, does not give the Court jurisdiction over plaintiffs' claims.

 Nor may plaintiffs urge that a right of action can be inferred from the law of nations. While international law may provide the substantive rule of law in a given situation, the enforcement of international law is left to individual states. *See, e.g.,* L. Henkin, R. Pugh, O. Schachter & H. Smit, **International Law** 116 (1980); Henkin, **Foreign Affairs and the Constitution** 224 (1972) ("International law itself, finally, does not require any particular reaction to violations of law ... Whether and how the United States wished to react to such violations are domestic questions ..."). As Judge Edwards stated in *Tel-Oren:* "[T]he law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations; by consensus, the states leave that determination to their respective municipal laws." 726 F.2d at 778.

It is important that this distinction be maintained for two reasons. First, as a matter of policy, the distinction is a fundamental aspect of international law's accommodation to principles of national sovereignty. The Nuremberg tribunal articulated this interest in *United States v. Altstoetter (The "Justice Case")*, (Trials of War Criminals, Vol. III, USGPO, Washington, 1951), when it stated:

This universality and superiority of international law does not necessarily imply universality of its enforcement ... The law is universal, but such a state reserves unto itself the exclusive power within its boundaries to apply or withhold sanctions. Thus, notwithstanding the paramount authority of the substantive rules of common international law, the doctrine of national sovereignty have been preserved through the control of enforcement machinery.

Second, the distinction reflects the practical limits on enforcement of international law by municipal courts. The absence of a consensus on international law, particularly with respect to technical issues created by the wide array of legal systems in the world, makes it "hard even to imagine that harmony ever would characterize this issue." *Tel-Oren*, 726 F.2d at 778 (Edwards, J., concurring).

Thus, although plaintiffs cite a number of jurists and commentators who describe customary international law *substantively*, they have not pointed to any source, and the Court has found none, for the proposition that one looks to the law of nations to determine the *actionability* of conduct condemned by that body of law. The Court declines to rewrite a long-established rule based on sound policy concerns. The law of nations therefore does not provide plaintiffs with a private right of action in this municipal court.

The third possible source of a right of action, urged particularly by amicus ACLU, is federal common law. They argue that the present case is analogous to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bivens*, 403 U.S. at 392, 91 S.Ct. at 2002, *quoting from Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). As amicus puts the argument, "the legal prohibition of such conduct entitles the plaintiffs to sue for damages, just as the rights guaranteed by treaties, statutes, and the Constitution may by their very nature justify private enforcement." Amicus brief, p. 17.

■ However, the step encouraged by amicus fails to recognize the fundamental difference between municipal enforcement of municipal law and municipal enforcement of international law. The Supreme Court has noted that, under *Bivens*, there may be "special factors counseling hesitation in the absence of affirmative action by Congress." *Carlson v. Green*, 446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980). In the present case, the "special factor" is the absence of any affirmative legislative action at all. Unlike violations of federal statutes or the United States Constitution, no American legislative body has acted in any way with respect to customary international law. To imply a cause of action from the law of nations would completely defeat the critical right of the sovereign to determine whether and how international rights should be enforced in that municipality. As stated in the **Restatement (Second) Foreign Relations** § 3 (1965), a violation of international law gives to individual litigants such remedies or defenses in a forum of a state *"as are provided by its domestic law."* Until Congress evinces an intent to give effect to international law, either by passing a jurisdictional statute or by incorporating international rights into the statutes of the United States, the Court declines to infer such an intent solely from the United States' membership in the community of nations.

### B. Stating a Claim under International Law.

Even assuming that the Court has jurisdiction over plaintiffs' customary international law claims, plaintiffs have not stated an actionable claim pursuant to Fed.R. Civ.P. 12(b)(6). Two issues are raised by plaintiffs' claims: first, whether the alleged acts constituted a violation of international law at the time they were committed; and second, whether the claims would be time barred.

It appears clear that the acts of genocide, torture, enslavement, and religious discrimination alleged in plaintiffs' complaint constituted violations of the laws of humanity at the time they were committed.

In the late nineteenth century, occasional treaties began to reflect a growing consciousness of fundamental human rights. For example, in 1878, under the Treaty of Berlin, the people of Serbia, Montenegro, and Rumania were guaranteed freedom of religious practice. *See* Gutteridge, *War and Human Rights*, in **An Introduction to the Study of Human Rights** (F.Vallat ed. 1972). Slavery was abolished by the seventeen signatory nations to the Brussels Agreement of 1890. Lippman, *Human Rights Revisited: The Protection of Human Rights under the International Covenant on Civil and Political Rights*, 10 **Cal.W.Int'l L.J.** 450, 454 (1980). Finally, at the Hague Conferences of 1899 and 1907, the signatory countries established detailed rules for land and naval warfare as well as for the treatment of prisoners of war. *Id.*

Despite this increasing awareness of international human rights, at the end of World War I there was not a generalized recognition of the "laws of humanity." For example, the American delegates to the 1919 Paris Convention expressed considerable reservations regarding the condemnation of violations of "the laws of humanity" contained in the report of the Paris Commission on Responsibility of Authors of the War. *See The Justice Case* at 978.

Nevertheless, international law continued to develop in the decades between the two world wars. Protection for minority groups received particular attention as multi-national kingdoms were replaced with nation states:

> On the one hand, with the disappearance of multi-national, non-racial states, such as the old Austro-Hungarian and Turkish Empires, almost every European nation came to be dominated by a single nationality which, without special measures of protection, might abuse its position at the expense of the minorities. On the other [hand], the ideal of self-determination itself presupposed a special concern to protect all national groups even if, for reasons of their geographical distribution, they were not able to enjoy that right in a direct form.

Luard, *The Origins of International Concern Over Human Rights,* **The International Protection of Human Rights** (E. Luard, ed., 1967). This concern for minority groups led to a League of Nations requirement that all new or substantially enlarged states, including Yugoslavia, assume obligations for the protection of their minorities as a condition of recognition of their independence or new frontiers. Lippman, *supra.* at 455. The minority treaty signed by Yugoslavia as well as many other European countries placed members of racial, religious, or linguistic minorities "under the guarantee of the League of Nations," and "guaranteed such rights as freedom from discrimination in civil and political affairs, and the free exercise of speech and religion." McCartney, *League of Nations Protection of Minority Rights,* in E. Luard, *supra.* at 23, 25.

The work of the League of Nations suggests that there was a general recognition of the rights of religious and ethnic minorities by the time of the outbreak of World War II. The existence of this consensus was confirmed by the Nuremberg court sitting immediately after World War II. That court, when faced with the issue of whether "crimes against humanity" were part of the law of nations prior to World War II, quoted with approval from Sir David Maxwell-Fyfe:

> With regard to "crimes against humanity," this at any rate is clear. The Nazis, when they persecuted and murdered countless Jews and political opponents in Germany, knew that what they were doing was wrong and that their actions were crimes which had been condemned by the criminal law of every civilized state. When these crimes were mixed with the preparation for aggressive war and later with the commission of war crimes in occupied territories, it cannot be a matter of complaint that a procedure is established for their punishment.

*The Justice Case* at 976. Although the law of nations was not codified until after the war, the court concluded that the notion of the "laws of humanity," put forward initially in the 1919 Paris Commission on Responsibility of Authors of the War, had clearly become an international consensus by the time of World War II. *Id.* at 978.

 It therefore seems clear that defendant's alleged actions constituted a violation of international law when they were committed. Turning to the second question raised by plaintiffs' claim, namely, what is the applicable statute of limitations for this violation, plaintiffs urge the Court to look to international law, noting that "the incorporation of the law of nations into federal common law permits a federal court to determine an appropriate period of limitations without regard to the parochial interests of the forum state." Plaintiffs' Opp., pp. 40–41. They further argue that in applying this federal common law, the universal consensus condemning defendant's behavior "requires this court to look to international standards before applying any limitations for actions of this nature." *Id.* at 40.

Assuming, *arguendo,* plaintiff's initial premise that federal rather than state law should provide the applicable rule of decision regarding the limitation of actions [3], there is no basis in the cases or commentaries for the conclusion that international law should govern the procedural aspects of plaintiffs' claim. Even plaintiffs' expert, Professor Almond, states that "the practice of states does not show that statutes of limitation have been established, as such, applicable as part of the international law shared among nations." Almond Aff., ¶ 10. It is therefore municipal, rather than international, law that must provide the rule of decision for plaintiffs' international law claims.

**3.** In the two sets of federal statutes most analogous to the present case—the Reconstruction civil rights statutes and the Racketeering and Corrupt Influences Act—Congress has chosen to rely on state law to provide the applicable statute of limitations. Congressional willingness to rely on state limitations statutes in the civil analogous to federal criminal statutes indicates that this might also be the appropriate rule under federal common law.

■ In ascertaining the federal law that should govern plaintiffs' claims, considerable energy has been expended by the parties on the issue of whether or not the United States has endorsed the statute of no limitation set forth in the Convention on the Non-Applicability of Statutes of Limitation to War Crimes and Crimes Against Humanity, *adopted and opened for signature*, G.A.Res. 2391 of November 26, 1968 (*entered into force* November 11, 1970). From the proceedings in the United Nations General Assembly, it appears that the United States did support the principle of a statute of no limitations. In Press Release US–UN 220 (1968), November 26, 1968, the United States delegation stated that

> the original purposes of this convention were—(1) to make clear that under international law there are no periods of limitation applicable to war crimes and crimes against humanity, and (2) to establish a new rule of international law by treaty that states which become parties to the convention should adopt necessary measures to abolish domestic statutes of limitation insofar as they might apply to war crimes and crimes against humanity.

The reasons enumerated by the delegation for opposing the draft convention do not suggest that the United States had any reservations about this initial purpose. Indeed, in a prior press release, the delegation had "urge[d] the Committee to reconsider whether it would not be better to return to the original purpose of this item —namely, to produce a convention limited simply to non-application of statutes of limitations to war crimes and crimes against humanity." Press Release US–UN 161 (1968), October 9, 1968. Thus, while the United States did not sign the resulting convention, it appears to recognize the principle that a statute of no limitation should be applied to the criminal prosecution of war crimes and crimes against humanity.

Regardless of what was the position of the United States, however, the period of limitations appropriate for criminal prosecution does not suggest that a similar rule should be adopted for civil actions. In American jurisprudence, criminal and civil statutes of limitations have different conceptual underpinnings. For criminal violations, the common law rule was that there was no limitation as to the time within which offenses might be prosecuted. *United States v. Fraidin*, 63 F.Supp. 271, 278–79 (D.Md.1945). Criminal statutes of limitations were therefore adopted at the will of the legislature, and were, in effect, an act of grace by which the sovereign surrendered its right to prosecute. Because these statutes are equivalent to acts of amnesty, the length of the statute of limitations bears a necessary relation to the heinousness of the crime. For example, in federal law, no statute of limitation exists for capital crimes, while non-capital crimes generally have a limitations period of five years. *See* 18 U.S.C. §§ 3281–82. Given the extreme nature of war crimes and crimes against humanity, the position of the American delegation that these violations should have no statute of limitations is consistent with the nature of criminal limitation statutes.

Civil statutes of limitation, by contrast, are viewed as a procedural requirement designed to protect against stale claims, and are unrelated to the underlying merits of the action. *See Stewart v. United States*, 503 F.Supp. 59, 63 (N.D.Ill.1980), *aff'd*, 655 F.2d 741 (7th Cir.1981), *aff'd*, 659 F.2d 1084 (1981) ("the operation of statutes of limitation was intended to be somewhat mechanical and ordinarily unrelated to the merits of the litigation"); *see also Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944) ("the theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them"). This procedural concern with stale claims causes civil statutes of limitation to be divorced from the seriousness of the underlying allegations. For example, in California, the applicable statutes are the reverse of what one would expect from the gravity of the violation: the limitation for breach of written contract is four years; for false advertising,

three years; and for wrongful death, one year. The length of the statute is clearly determined on a different basis: the amount of time within which it is reasonable to expect plaintiffs to present their claims; the concern for protecting against the loss of evidence; and the need to suppress fraudulent and stale claims from springing up after long periods of time. *See United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979).

Considering these factors, plaintiffs' international law claims should have a shorter rather than a longer limitations period. First, like instances of wrongful death, crimes against humanity are immediately known to the victims and their families. Second, a claim of a crime against humanity is one that is particularly susceptible to the loss of evidence through the death or disappearance of witnesses and the loss of documents; it is unlike a claim for breach of a written contract, where the most critical evidence does not change with time. Finally, the gravity of international law violations mandates a reasonably short period to protect individuals from fraudulent claims.[4]

██ In light of these considerations, the Court does not need to determine the precise limit applicable to plaintiff's cause of action in order to hold that thirty five years is beyond the time within which plaintiffs should have brought their claims. The parties have not brought to the Court's attention any civil statute of limitations, either in domestic law or in an international forum, that comes close to the length of time involved here. While defendant's alleged activities shock the conscience, the gravity of this conduct does not play the role in civil limitation statutes that it fulfills in criminal statutes. Criminal prosecutions of crimes against humanity should be and are subject to a statute of no limitations; but civil actions cannot be subjected to this rule under American law.

### III. Cause of Action under Yugoslavian Law.

Plaintiff's cause of action under Yugoslavian law is predicated upon two sets of provisions in the Yugoslavian Criminal Code which were enacted at some unknown time after the termination of World War II: Articles 100, 141, and 145 of the Criminal Code, which make it a criminal act to have committed acts of genocide or personal injury for nonmilitary purposes in World War II; and Article 125, which provides that anyone who confiscated belongings of another during World War II for nonmilitary purposes is subject to criminal prosecution. In 1965, Yugoslavia amended its criminal code to provide a statute of no limitation for the enforcement of these articles.

Articles 100, 125, 141, and 145 may form the basis for a civil proceeding pursuant to an unspecified provision of Yugoslavian civil law that permits individuals who sustained injury or damages as a result of acts of genocide and personal injury or confiscation of property for nonmilitary purposes, to have a private right of action against those individuals who would be subject to criminal prosecution for such acts. The statute of no limitations is applicable to civil actions pursuant to Section 20 of the Yugoslavian Statute of Limitations, enacted in 1953, which provides that the statute of limitations upon criminal actions shall serve as the statute upon civil actions if the conduct complained of in the civil action could subject the defendant to a criminal prosecution.

Defendant moves to dismiss plaintiffs' claim under these provisions of Yugoslavian law on the ground that it fails to state a cognizable claim for relief. The Court agrees for two reasons. First, in applying California conflict of law principles to the case at bar, California's rather than Yugoslavia's statute of limitations should be applied. Under this statute, plaintiffs' claim

---

**4.** To hold that a short limitations period is appropriate is not to suggest that tolling provisions should apply with any less effect. A wide variety of considerations, from the disruptions of war to the difficulty in obtaining authenticated documents located in confidential government files, might justify delay in bringing suit for war crimes or crimes against humanity.

**1432**

is time-barred. Second, even if Yugoslavia's limitation statute is applied, the substantive statutes relied upon by plaintiffs are unconstitutional under the laws of California and the United States, as well as unenforceable under Yugoslavian and international law.

## A. The Statute of Limitations.

In diversity cases, a federal court applies the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the laws of more than one jurisdiction are at least arguably at issue, the *Erie* reference to state law includes application of the state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfting Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the present case, therefore, California conflict of law principles should be applied to determine whether the California or the Yugoslavian statute of limitations should govern.

However, it is first necessary to determine California's approach to resolving conflicts between statutes of limitation. The traditional choice of law rule pertaining to statutes of limitation is that they are procedural in nature and therefore governed by forum law, *see* **Restatement (Second) of Conflict of Laws** § 142(1) (1971), and this principle has been widely followed in California. *See, e.g., Klingebiel v. Lockheed Aircraft Corp.,* 494 F.2d 345 (9th Cir.1974) (applying California law); *St. Louis-San Francisco Railway Co. v. Superior Court,* 276 Cal.App.2d 762, 767, 81 Cal.Rptr. 705, 708 (1969) ("if the matter is purely procedural the law of the forum must be applied since 'the forum does not adopt as its own the procedural law of the place where the tortious acts occur' "); *see also* cases cited in 2 Witkin, CALIFORNIA PROCEDURE § 57 (2d ed. 1970). However, one California appellate court has adopted the "governmental interest" approach when considering which statute of limitations should apply. *See Ashland Chemical Co. v. Provence,* 129 Cal.App.3d 790, 181 Cal.Rptr. 340 (1982). Because California law on this issue is uncertain, it is necessary to apply both tests to determine whether plaintiffs' claim is time-barred.

## 1. The traditional test.

In *Kalmich v. Bruno,* 553 F.2d 549 (7th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977), the Seventh Circuit applied the traditional conflicts rule to Section 20 of the Yugoslavian Statute of Limitations (1953) and to Article 134 of the Yugoslavian Criminal Code (1965), two of the statutes that are at issue in this case. Kalmich, a Jewish businessman in Serbia at the time of the outbreak of World War II, had had his business seized pursuant to the anti-Jewish laws adopted by the Economic Plenipotentiary for the Economy of Serbia after the Nazi conquest of Yugoslavia. Defendant Bruno allegedly purchased the business at an understated price and managed it at considerable profit to himself. Kalmich sought recovery against Bruno on a constructive trust theory under Yugoslavian law. After finding that Yugoslavian substantive law was proper to apply in the case, the Seventh Circuit concluded that, under Illinois conflicts law, the Yugoslavian rather than the Illinois statute of limitations governed Kalmich's claim. Because of *Kalmich*'s strong bearing on this case, it is necessary carefully to consider its reasoning as applied to the case at bar.

The Seventh Circuit began in *Kalmich* by acknowledging that under Illinois conflict principles, the limitations statute of the forum state usually applies because it is a "procedural" rather than a "substantive" rule. However, *Kalmich* reached a different result for three reasons. First, the court noted that an exception to the "procedural" rule was outlined in *Davis v. Mills,* 194 U.S. 451, 454, 24 S.Ct. 692, 694, 48 L.Ed. 1067 (1904), where the Supreme Court held that "the limitation goes to the right created and accompanies the obligation everywhere ... if the limitation ... was directed to the newly created liability so specifically as to warrant saying that it qualified the right." 194 U.S. at 454, 24 S.Ct. at 694. *Kalmich* concluded that this exception applied in the case before it, be-

cause, while Article 20 did not have the requisite specificity when passed in 1953, it became sufficiently specific with the passage of Article 134(a) in 1965. The court stated:

> Article 134(a)'s treatment of war crimes for criminal purposes carried into Section 20 by necessary implication. That this effect was not made express in Article 134(a) and results only by reading that statute with Section 20 does not, as has been seen, make the effect any less specific. So far as appears, war crimes referred to in Article 134(a), and only those crimes, were made perpetually punishable, and causes of action based on these crimes, and only such causes of action, were made perpetually actionable. The limitations provisions of Yugoslavia were sufficiently and specifically part and parcel of the substance of the Yugoslavian statutory right, and the district court erred in refusing to apply them.

*Kalmich*, 553 F.2d at 555.

The second reason the *Kalmich* court found for applying Yugoslavian procedural law was that to do so was consistent with Illinois' approach to the problem raised when the forum's statute of limitations is shorter than the locus' statute of limitations. *Kalmich* noted that two positions might be taken on this issue, depending on the considerations behind the state's statute. On the one hand, the forum's court might find that its statute should be applied because the forum has an interest in "discouraging plaintiffs from sleeping on their rights, and limiting the use of the forum's courts to cases in which it is thought that the matters in question are fresh enough to allow a fair rendering of justice." 553 F.2d at 554. On the other hand, the forum court might conclude that where the forum's general statute conflicts with the specific statute of the locus of the tort, the latter should prevail because it is

inseparably intertwined with the substantive foreign law that the forum state was applying. After analyzing Illinois law, *Kalmich* concluded that the latter conceptual approach was the law in Illinois. It bolstered this conclusion by observing that the defendant had agreed to the district court's use of this test, and therefore he had waived his right to object to it. *Id.*

The final reason elucidated in *Kalmich* for applying the Yugoslavian statute was that Illinois did not have any policy interest in reaching a contrary result. Although the court recognized "the desirability of discouraging litigants from sleeping on their rights" under Illinois law, it found that "there would appear to be no aspect of sleeping on rights here." 553 F.2d at 555. Earlier in the decision, the court had noted:

> After the end of the war, Kalmich spent substantial time, money, and effort unsuccessfully attempting to find Bruno for redress in a search that covered five countries. It was only in May of 1972 that Kalmich discovered, from sources not disclosed, that Bruno was living in Chicago, Illinois. This lawsuit followed.

553 F.2d at 551. The court's holding was therefore consistent with various Illinois statutes that tolled the running of the limitations period, and Illinois public policy would not be offended by applying the Yugoslavian statute. *Id.* at 556.

This Court has reservations about *Kalmich*'s initial conclusion that the unlimited statutory period created by combining Article 134 and Section 20 is "inextricably tied" to the substantive rights established at an unknown time by the passage of Articles 100, 125, 141, and 145 of the Yugoslavian Criminal Code.[5] Assuming, however, that the *Kalmich* court correctly analyzed the relationship between the Yugoslavian limitations statute and plaintiffs' substantive cause of action, this case differs from *Kal-*

---

5. It is clear that Article 134, the criminal statute of limitations, specifically relates to the substantive criminal laws involved, and therefore it satisfies the "specificity" test of *Davis v. Mills*. *See* **Restatement (Second) of Conflict of Laws** § 143, comment c (1971); *see also Bournias v. Atlantic Maritime Co.,* 220 F.2d 152 (2d Cir.

1955). It is less clear that in passing the criminal statute of limitations, the Yugoslavian legislature intended to have that statute apply, through the general civil statute of limitations, and through the civil enabling statute, to private actions under the substantive criminal law.

*mich* with respect to both of the other factors relied on by the Seventh Circuit. First, under California law, the limitations statute of the foreign jurisdiction is not applicable where it provides for a longer period than the relevant California statute. *Zellmer v. Acme Brewing Co.*, 184 F.2d 940, 943 (9th Cir.1950). As *Kalmich* noted, the reason for this rule is the forum state's interest in discouraging plaintiffs from sleeping on their rights, and preserving use of the forum's courts for cases in which the matters in question are fresh enough to allow a fair rendering of justice. *See* 553 F.2d at 554. California courts have specifically embraced this reasoning as the consideration underlying California's statute of limitations:

> Statutes of limitation are enacted as matters of public policy designed to promote justice and prevent the assertion of stale claims after the lapse of long periods of time (*Pashley v. Pacific Elec. Ry. Co.*, 25 Cal.2d 226, 153 P.2d 325). Statutes of limitation are not disfavored in the law. To the contrary they are favored in the law because they promote desirable social ends and give security and stability to human affairs (*Scheas v. Robertson*, 38 Cal.2d 119, 238 P.2d 982).

*McGee v. Weinberg*, 97 Cal.App.3d 798, 804, 159 Cal.Rptr. 86, 90 (1979). This California public policy behind its limitation statutes indicates that California would decline to apply the longer Yugoslavian statute.

The second, and even more significant, difference between *Kalmich* and the case at bar pertains to whether there was any aspect of sleeping on rights in the case. In *Kalmich*, the plaintiff had unsuccessfully sought for defendant's whereabouts in five countries. When defendant was finally located, plaintiff promptly brought suit. Here, by contrast, the whereabouts and alleged activities of defendant have been a matter of very public record since the early 1950's. *See, e.g., Artukovic v. Boyle*, 140 F.Supp. 245 (S.D.Cal.1956), *aff'd sub nom., Karadzole v. Artukovic*, 247 F.2d 198 (9th

Cir.1957), *vacated and remanded*, 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356 (1958).[6] Plaintiffs have not alleged that they did not know that defendant resided in California, or that newly discovered evidence linked him to their claims, or any other fact, apart from the disruption of the war itself, that would trigger considerations of the kind involved in California's, or any other state's, tolling provisions. Plaintiffs slept on their rights for more than thirty years; and California's public policy against permitting plaintiffs to do so strongly militates against the application of the Yugoslavian statute in the case at bar.

■ Thus, the present case is distinguishable from *Kalmich*. California law, unlike Illinois law, emphasizes the defendant's and the forum court's interest in barring stale claims. Furthermore, the facts in this case indicate that plaintiffs have slept on their rights for several decades. For both of these reasons, California's rather than Yugoslavia's limitation provisions should apply to this case.

**2. The governmental interest test.**

■ In *Ashland Chemical Co. v. Provence*, 129 Cal.App.3d 790, 794, 181 Cal. Rptr. 340 (1982), the court concluded that California's governmental interest approach to conflicts of law should be applied to procedural as well as substantive questions. Under this approach, the Court must examine the policies underlying the competing laws of the involved states to determine which state is "interested" in having its laws applied to the issues in question. When only one of the two potentially concerned states has an interest in having its law applied, the conflict of laws is deemed to be "false"; the court simply applies the law of the sole interested state. *Ashland*, 181 Cal.Rptr. at 341; *Hurtado v. Superior Court*, 11 Cal.3d 574, 114 Cal. Rptr. 106, 522 P.2d 666 (1974). If a "true conflict" exists between the laws of the two forums, the Court must then determine

---

**6.** One of plaintiffs' experts has argued that this case is "as though Adolf Hitler were to suddenly be found on the streets of California." Ferenz

Aff., ¶ 12. Culpability aside, the description fits *Kalmich*, not this case.

which state's interest would be more impaired if its interest were subordinated. *See, e.g., Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 101 Cal.Rptr. 314 (1972).

■ The analysis in *Ashland* suggests that the present case is one of "false conflict" as that term is applied by California courts. In *Ashland,* as here, the transaction took place entirely in the foreign jurisdiction: the note was executed there, the place of payment was there, and the contract provided that the foreign jurisdiction's law would apply. However, *Ashland* held that "while these contacts might support the parties' choosing Kentucky law to govern the substantive aspects of their contract, they are irrelevant in determining whether Kentucky is substantially related to the transaction for the purpose of applying its statute of limitations." *Ashland,* 181 Cal.Rptr. at 342. Only three governmental interests were implicated in a conflict between limitation statutes: the place of the litigation, the residence of the defendant, and the length of time provided in the two statutes. *Id.,* 181 Cal.Rptr. at 341 & 342 n. 2. These factors all weigh in favor of applying California law in the present case. First, this Court sits in California and applies California law. Second, the Yugoslavian statute is longer than California's, so Yugoslavia's interest in applying the statute is less compelling. Finally, although defendant is a citizen of Yugoslavia, he has been a resident of this state for more than three decades, and California's interest in discouraging stale claims applies to all individuals who would seek the protection of the state's courts and whose rights the state endeavors to guard. Under the *Ashland* factors, therefore, this case presents an instance of false conflict,

and California procedure should provide the applicable time limitation.

Nor is this case distinguishable on the ground that the Yugoslavian substantive and procedural rights are inseparable. Assuming this to be the case, Yugoslavia has an interest in having its limitation policy govern, so that a party given a claim for relief will also have the period of time it has granted. If a California court dismisses the action under the California statute, Yugoslavia's interest is impaired, and there exists a "true conflict" of interests that must be resolved through an analysis of comparative impairment of interests between the two states. *See* Horowitz, *The Law of Choice of Law in California—A Restatement,* 21 **UCLA L.Rev.** 719, 742 n. 6 (1974).

■ Even if this case involves a "true conflict," however, comparative impairment analysis still requires that California provide the procedural rule of law. The goal of comparative impairment analysis under California choice of law principles is to accommodate each state's interest by drawing a line that provides maximum scope for each state's policy. *See* Horowitz, *supra.* An important variable in this accomodation, and one that is critical here, is time.[7] California's interest in protecting its residents and courts from stale claims prevails at some point over Yugoslavia's interest in an unlimited statute. Thus, while in other circumstances Yugoslavia's statute might be applicable to a case brought in a California forum, the relative intensity of each state's interests in this case counsels against the application of Yugoslavian law.

In summary, whether scrutinized under traditional terms, "false conflict" analysis, or "comparative impairment" analysis, the

---

**7.** The importance of time in resolving "true conflicts" under comparative impairment analysis is illustrated in *Ex parte Archy,* 9 Cal. 147 (1858), which Professor Horowitz has described as the paradigmatic application of California choice of law principles. *See* 21 **UCLA L.Rev.** at 720–21. In *Archy,* a Mississippi slave owner had come to California to stay for an indefinite period of time, and he had brought one of his slaves with him. The question before the court was whether California or Mississippi law gov-

erned the slave's legal status. The Court concluded that Mississippi law would govern if the owner and slave were in California for only a short time. However, . California's interest in prohibiting slavery would come to dominate if they stayed in California for a longer period. Professor Horowitz described this accommodation of interests over time as an ideal example of a court "in effect develop[ing] a spectrum of significance" under comparative impairment analysis.

particular facts, law, and public policy involved in this case lead the Court to decline to apply the Yugoslavian statute of limitations.

### B. The Application of Substantive Yugoslavian Law.

 Even if the Yugoslavian statute of limitations were to apply to this case, the Court would feel constrained not to enforce it for several reasons. First, from plaintiffs' complaint, it is clear that the substantive criminal statutes which form the basis for their claim were all passed after the date of the alleged occurrences. *See* Complaint, ¶¶ 68–71, 73, 75. The claim therefore runs afoul of the constitutional ban on ex post facto laws. An ex post facto law is "a statute which deprives a man of his estate, or any part of it, for a crime that was not declared to be an offense by any previous law." 1 Antieau, **Modern Constitutional Law** 412 (1969). A statute falls within the prohibition if it either (1) makes criminal that which was not so at the time the action was performed; or (2) inflicts a greater punishment than the law annexed to the crime when it was committed. *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); *Santa Monica Community College v. Public Employment Relations Board,* 112 Cal.App.3d 684, 690, 169 Cal.Rptr. 460 (1980). The bar upon ex post facto laws cannot be evaded by giving civil form to laws with a "criminal" or "punitive" effect; the prohibition is directed at the substance and not the form of the legislation:

> [W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding.

*Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1867).

In this case, although the penalty imposed is civil, the cause of action is for violation of Yugoslavian criminal law. It is therefore simply the civil supplement to a criminal statute, and, as such, it falls with the ban upon ex post facto laws contained in Article 1, § 9 of the United States Constitution and Article 1, § 9 of the California Constitution.

A second problem raised by enforcement of the Yugoslavian statutes is that it would require this Court to breach international law. As has been noted, the work of commentators serves as an indication of the status of customary international law. One such commentary is the **Restatement (Revised) of Foreign Relations** (1965). In section 492 of the **Restatement,** it provides certain grounds under which a municipal court must refuse to enforce the judgment of a foreign court, stating in relevant part:

> (1) A judgment of the court of a foreign state may not be granted recognition by a court in the United States if:
>
> > (a) the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law . . .

 In determining whether a judgment was rendered under a system that comports with due process, the court "must satisfy itself of the essential fairness of the judicial system under which the judgment was rendered." Comment b; *see generally Hilton v. Guyot,* 159 U.S. 113, 202, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895). One of the essential requirements of fairness in international law is that persons may not be subjected to laws that make criminal, actions which were innocent at the time. *See, e.g.,* International Covenant on Civil and Political Rights, Annex to G.A.Res. 2200, 21 U.N.GAOR Supp. (No. 16) at 52, U.N.Doc. A/6316 (1966), Article 15, § 1 ("no one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international law, at the time when it was committed"). Another essential requirement is that the

suit be brought within a reasonable time. *See* Brierly, **The Law of Nations** 287 (6th ed. 1963) (under international law, "corruption, threats, *unwarrantable delay,* flagrant abuse of judicial procedure, a judgment dictated by the executive, or so manifestly unjust that no court which was both competent and honest could have given it" provide instances of a denial of justice). On both of these grounds, the Court would be compelled to deny enforcement of plaintiff's judgment if they had obtained it from a Yugoslavian court. It follows that this Court will not directly enforce a Yugoslavian statute when to do so would violate fundamental notions of fairness under international law.

A final difficulty with the Yugoslavian criminal statutes upon which plaintiffs rely is that they do not appear to be enforceable under the Yugoslavian Constitution. Article 181 of the Yugoslavian Constitution provides:

> No one shall be punished for any act which before its commission was not defined as a punishable offence by statute or a legal provision based on statute, or for which no penalty was threatened.

It might be argued that the provisions of the Yugoslavian Constitution should not be enforced by this Court, since it is debatable whether these terms would be given effect in Yugoslavia itself. However, as the district court noted in *Filartiga v. Pena-Irala,* 577 F.Supp. 860 (E.D.N.Y.1984), foreign countries should be held to their national pronouncements. *See Filartiga,* 577 F.Supp. at 864 ("In concert with the other nations of the world Paraguay prohibited torture and thereby reaped the benefits the condemnation brought with it. Paraguayan citizens may not pretend that no such condemnation exists"). Although it is plaintiffs rather than defendant who rely upon foreign law in this case, the principle remains the same: plaintiffs have invoked Yugoslavian law, and they must be willing to abide by the guarantees of fairness and justice recognized under formal Yugoslavian law.

In conclusion, the Court declines to apply the ex post facto Yugoslavian criminal statutes which form the substantive basis for plaintiffs' fourth cause of action. This conclusion is consistent with California conflict of law principles, which recognize that strong public policy interests may override the other forum's interest in the application of its substantive law. In *In re Paris Air Crash of March 3, 1974,* 399 F.Supp. 732 (C.D.Cal.1975), the court, applying California conflict rules, refused to apply foreign law, stating:

> A third and final reason for not applying Cambodian law lies in the very nature of this Court. We are a Court of the United States, an instrumentality created to effectuate the laws and policies of the United States. We conclude that in this case we have no warrant, legal or moral, to frustrate well established American policies by an application of local policies by a foreign government.

399 F.Supp. at 745 (*quoting Challoner v. Day & Zimmerman, Inc.,* 512 F.2d 77, 82 (5th Cir.), *vacated,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975)). In this case, the public policies of both California and the United States require this Court to decline the invitation to apply unconstitutional laws to persons within its jurisdiction. To do more would seriously jeopardize the fundamental principle that all persons, no matter of what they stand accused, are entitled to the same constitutional rights enjoyed by all who live within this municipality.

IT IS THEREFORE ORDERED that plaintiffs' complaint be dismissed with prejudice.